IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


**ROBIN R. JOHNSON,**

     **Plaintiff,**

**vs.**                   **Case No.  1:14cv149-WS/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social**
**Security,**

     **Defendant.**

_____/


## REPORT AND RECOMMENDATION

     This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of the Social Security Administration (SSA) denying Plaintiff's application for Supplemental Security Income (SSI) benefits.  After careful consideration of the entire record, it is respectfully recommended that the decision of the Commissioner be reversed and remanded for further proceedings.

### I.  Procedural History

     On January 25, 2010, Plaintiff, Robin R. Johnson, filed an application for SSI benefits, as amended, alleging disability beginning July 1, 1996, based on a neck and back disorder, anxiety, depression, thyroid, Hepatitis C, and carpal tunnel.  R. 19, 141-47, 166, 171, 183; *see* R. 193-97 (Mar. 15, 2000, application update noting, in part, a

diagnosis of fibromyalgia).  (Citations to the record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)

Plaintiff's application was denied initially on June 28, 2010, and upon reconsideration on February 3, 2011.  R. 19, 77-79, 81-82, 84-103.  On April 7, 2011, Plaintiff requested hearing.  R. 19, 84.  On March 9, 2012, Plaintiff appeared pro se in Gainesville, Florida, and testified at a video hearing conducted by Administrative Law Judge (ALJ) Teresa J. McGarry in Jacksonville, Florida.  R. 19, 33, 45-65, 68-73.  Ted D. Mitchell, D.C., M.R.C., C.R.C., C.V.E., an impartial vocational expert, testified during the hearing.  R. 19, 66-68, 136-38 (Resume).  The ALJ asked Plaintiff whether she wanted to review her case with a lawyer and whether she wanted additional time to consult with a lawyer.  Plaintiff responded she did not and stated, in part, that she "just mentally can't -- unable to do it."  R. 37.  The ALJ explained Plaintiff's options regarding representation, the process leading up to the hearing, and the purpose of the hearing. R. 35, 37-45.  Plaintiff desired to go forward with the hearing.  R. 42-43.  The ALJ stated in her decision: "Although informed of the right to representation, [Plaintiff] chose to appear and testify without the assistance of an attorney or other representative."  R. 19, 35, 37-45.

On July 24, 2012, the ALJ issued a decision denying Plaintiff's application for benefits.  R. 19-27.  On October 22, 2012, Plaintiff, by her current lawyer, filed a request for review.  R. 11-15.  On June 27, 2014, the Appeals Council noted that the request for review was not filed on time, but determined there was "good reason for the delay,"

R. 4-5, 255-56 (Plaintiff's Affidavit).  R. 1.  The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. R. 1-6; *see* 20 C.F.R. § 404.981.

On August 22, 2014, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of law, docs. 14 and15, which have been considered.

On February 26, 2015, the Court requested the parties to file supplemental memoranda addressing how Social Security Ruling (SSR) 12-2p, 2012 SSR LEXIS 1 (eff. July 25, 2012) impacts this case and whether remand is appropriate.  Doc. 16.  The Commissioner had cited to this ruling in her memorandum.  Doc. 15 at 9-10.  Social Security Ruling 12-2p "provides guidance on how we develop evidence to establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM), and how we evaluate FM in disability claims and continuing disability reviews under titles II and XVI of the Social Security Act (Act)."  *Id.* at *1.  This social security ruling became effective on July 25, 2012, a day after the ALJ entered her decision on July 24, 2012, R. 27, but before the Appeals Council entered its decision on June 27, 2014, R. 1.  The parties filed supplemental memoranda and they have been considered.  Docs. 17 and 20.  The Commissioner responds that remand is not required.  Doc. 17.  Plaintiff "does not believe the [ALJ] was required to apply SSR 12-2p to the case at bar."  Doc. 20.[1]

---

[1]  The issue raised in the Order requesting supplemental memoranda was not whether the sitting ALJ was required to apply SSR 12-2p because this ruling was not available when she entered her decision.  Doc. 16 at 3.  The parties were asked to address how SSR 12-2p impacts this case and whether remand is appropriate.  *Id.* at 4. In other words, the issue raised was whether the case should be remanded to give the ALJ an opportunity to re-consider her decision in light of SSR 12-2p.  *Id.*

## II.  Findings of the ALJ

The ALJ made several findings:

1.  Plaintiff "has not engaged in substantial gainful activity since January 25, 2010, the application date."  R. 21.

2.  Plaintiff has several "severe impairments: lumbar and cervical degenerative disk disease; depression; hypothyroidism under control; uterine fibroid; and anemia under control."  *Id.*  The ALJ did not "accept the claimant's assertion that fibromyalgia is a severe impairment as the medical record reveals no acceptable diagnostic testing results.  Additionally, the claimant sought no treatment for two years for this alleged condition and took no medication for it."  *Id.*

3.  Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  *Id.*

4.  Plaintiff has the residual functional capacity (RFC) "to lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit/stand/walk for a total of six hours in an eight-hour workday, and can push and/or pull unlimitedly.  The claimant can frequently climb ramps and stairs and occasionally climb ropes, ladders, and scaffolding.  She can frequently balance and occasionally bend, crouch, crawl, stoop, stand, and kneel.  She can use her hands and arms in all ways and has no vision, hearing, or communication limitations.  The claimant must avoid workplace hazards and is limited to performing simple, routine tasks with no production paced, assembly line deadlines."  R. 22.

5.  Plaintiff "has no past relevant work."  R. 26.

6.  Plaintiff "has at least a high school education and is able to communicate in English" and "[t]ranferability of job skills is not an issue because the claimant does not have past relevant work."  *Id.*

7.  "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform" such as marker, cafeteria attendant, and cleaner/housekeeping, all light, unskilled jobs within SVP of 2.  R. 26-27.[2]

---

[2]  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 416.968(a).  An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month."  Dictionary of Occupational Titles (DOT) (4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 416.967(b).

### III.  Legal Standards

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 416.920(a)(4)(i)-(v):

1.  Is the individual currently engaged in substantial gainful activity?

2.  Does the individual have any severe impairments?

3.  Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.  Does the individual have the residual functional capacity (RFC) to perform work despite limitations and are there any impairments which prevent past relevant work?[3]

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips v. Barnhart, 357 F.3d 1232, 1237

---

[3]  An RFC is the most a claimant can still do despite limitations.  20 C.F.R. § 416.945(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  Id.  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 416.946(c); see Social Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "residual functional capacity assessment" describes an adjudicator's finding about the ability of an individual to perform work-related activities.  The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

(11th Cir. 2004); <u>Jones v. Apfel</u>, 190 F.3d 1224, 1229 (11th Cir. 1999); <u>Chester</u>, 792

F.2d at 131; <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §

416.920(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must

prove that he or she cannot perform the work suggested by the Commissioner.  <u>Hale v.</u>

<u>Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  Evidence

### A.  Plaintiff

The ALJ summarized some of Plaintiff's hearing testimony.  R. 23, 25.  In

addition, Plaintiff stated that she was 52 years old as of the hearing.  R. 46.  She

graduated from high school, but did not have any other educational training after high

school.  *Id.*  Her husband was self-employed from the last month of 2007 until 2010 for

Gerard's Well Drilling.  *Id.* at 46-47; *see* R. 246.  Social Security records indicate that

self-employment earnings were reported for Plaintiff, and not her husband, who was

working in 2009 and 2010, in the amounts of $5,192 and $5,837, respectively.  R. 46,

150 156.  Plaintiff explained the reason why the amounts are in her name when she did

not work.  R. 47-48.  Plaintiff lost her Social Security benefits in 2008 when she married.

R. 47; *see* R. 38, 47, 58 (Plaintiff explaining she was declared disabled in 1996, but lost

her disability in 2008 when she got married.).  Her husband stopped working in 2010

due to his heart condition.  R. 47-48.  Plaintiff stated she had not worked since 1996.

R. 49.

The ALJ asked Plaintiff about her medical records.  R. 49-61.  Relevant here, the

ALJ referred to records from Dr. Rozboril from 2003, R. 258-62, with a second set

starting in 2008, ending in August 2010, R. 347-51, 388-93.  R. 49-50.  Plaintiff stated

that she could not afford to continue her treatment with Dr. Rozboril, but she had seen

him since August 2010.  R. 50.  The record contains follow-up records from

Dr. Rozboril from April 1, 2011, to March 6, 2012, and a letter dated March 6, 2012.

R. 533-44 (Exhibits 20F and 21F).

Plaintiff lives in her home with her husband.  R. 62.  Her in-laws are taking care

of them financially.  *Id.*  He husband is responsible for the upkeep of the house,

including lawn maintenance and laundry.  *Id.*; *see* R. 65.  She makes coffee sometimes

and drives to the store once in a while to pick up some items.  R. 62-63.  She has cats

and birds.  R. 63.  She and her husband have children.  Her daughter lives in Cleveland

and her son lives in Ocala.  She sees them infrequently.  R. 64.

On a good day, Plaintiff goes outside and sits on a bench and enjoys her

surroundings.  R. 64.  Infrequently, she visits a friend's 84-year-old mother and brings

her lunch.  *Id.*  "That's pretty much it."  *Id.*  Plaintiff stated that she would love to work

and not be "suffering the way that [she does]."  *Id.*  She suffers spasms in her legs; feels

she has deteriorated mentally and physically.  R. 65.  She gets confused when she has

an appointment and does not remember things that she has to do unless she has a list.

*Id.*

The ALJ made detailed findings, especially relating to Plaintiff's credibility.

R. at 22-25.

### B.  Dr. Ted D. Mitchell (vocational expert)

Dr. Mitchell testified as an impartial vocational expert.  R. 66-68.  Dr. Mitchell was

present for Plaintiff's testimony.  The ALJ advised Dr. Mitchell that she had no past

relevant work.  Dr. Mitchell stated that Plaintiff would not be competitive if he accepted

Plaintiff's testimony regarding her impairments.  R. 66.  The ALJ provided Dr. Mitchell

with a second hypothetical question:

> Q All right.  That being said -- oh, for the second hypothetical please consider these restrictions: She could occasionally lift and carry 20 pounds, frequently 10.  She can stand, walk and sit for six hours in an eight hour day.  There is no limitation on her ability to push and pull.
>
> Posturally she can frequently climb ramps and stairs, occasionally ladders, ropes and scaffolds, frequently balance, occasionally stoop, frequently kneel, occasionally crouch, frequently crawl.
>
> There's no restrictions on use of her hands and her arms, no vision restriction, no hearing restriction.  She should avoid hazards.  Additionally the job could be a simple one, two step job with no assembly line production quota requirement.
>
> With those restrictions, would there be any work that could be done in the state of Florida or the national economy?
>
> A Yes, Your Honor.  The individual in this hypothetical could perform the job of marker.  It has a <u>DOT</u> Code of 209.587-034.  It has an exertion level of light according to the <u>DOT</u>, SVP: 2, so it's an unskilled position.  There is an estimated 37,563 employees in the state and an estimated 471,000 employees in the nation.
>
> * * *
>
> A This individual could also perform the job of cafeteria attendant.  It is a <u>DOT</u> Code of 311.677-010.  It has an exertion level of light, according to the <u>DOT</u> and SVP: 2, so it's also unskilled.  There's an estimated 11,095 employees in the state and an estimated 139,328 employees in the nation.
>
> This individual could also perform the job of cleaner/housekeeping.  It has a <u>DOT</u> Code 323.687-014.  It has an exertion level of light, according to the <u>DOT</u> SVP: 2, so it's also unskilled.  There is an estimated 16,945 employees in the state and an estimated 218,560 employees in the nation.

R. 67-68.  Dr. Mitchell stated these jobs are representative samples.  R. 68.

The ALJ explained to Plaintiff that she had given Dr. Mitchell two hypothetical

questions and that she would review other documents referenced by Plaintiff during the

hearing.  *Id.*  Plaintiff then described the pain in her legs she has been having "for well

over 12 months." R. 69. She has had "a painful condition in [her] toes and in [her] heels. It actually started a year before [she] applied for Social Security in 2010 and it is ongoing. And the only thing that will alleviate the pain of the condition in [her] foot is elevation and ice." *Id.* Plaintiff referred to these conditions as "the peripheral neuropathy," diagnosed by Dr. Berens on July 21, 2011, "after they did the left foot X-ray that showed nothing wrong. So this is a condition that is ongoing that affects [her] ability to walk and stand and bend and squat." *Id.* Plaintiff also described her Hashimoto's disease with her thyroid that was diagnosed in 1999 and her fibromyalgia and resulting pain. R. 69-70. She also described her spinal injuries and her memory problems, and related adverse effects from thyroid medication making her dysfunctional. R. 70-71.

The ALJ again informed Plaintiff that additional medical records were needed before she would render a decision. R. 71-72.

### C. Medical evidence and other evidence

Plaintiff does not take issue with the ALJ's findings. Doc. 14. Rather, Plaintiff argues that the ALJ erred in not giving great weight to the opinion of her treating rheumatologist, Michael B. Rozboril, M.D. Doc. 14 at 8-18. Plaintiff refers to several patient notes from Dr. Rozboril from September 9, 2008, through March, 6, 2012, stating his impressions, including that Plaintiff has fibromyalgia with chronic pain and fatigue, chronic Hepatitis C, and depression related to her pain. Doc. 14 at 7-8.

The ALJ's RFC findings are included and supplemented where necessary.

The claimant alleges disability for pain and limitations caused by her medical conditions. At her hearing, the claimant testified that she has a high school education and resides with her husband. She reported that she was referred to a mental health provider but has not seen one. The claimant testified that she

cannot work because of numbness in her hands, an inability to stand for a long period of time due to neck and spinal pain, difficulties walking, bending, and squatting and depression and memory problems.  The claimant testified that pain in her feet is caused by peripheral neuropathy and is relieved by ice and foot elevation and that hand pain, numbness, and spasm is caused by fibromyalgia. She reported that she has unresolved thyroid problems.  The claimant's medication includes Diazepam, Roxycodone [sic], Synthroid, and Cytomel and causes side effects of headaches, stomachaches, and increased heart rate.

The claimant testified that she relies on her disabled husband to do household chores including cooking meals and maintaining the yard.  The claimant stated that she makes coffee, folds laundry, drives, and goes to the grocery store.  She has several pets.  The claimant reported that she visits with family.

The record reveals that the claimant presented to the field office on March 27, 2010 and demonstrated no difficulties in hearing, reading, understanding, concentrating, talking, standing, walking, or using her hands (Ex. 1E).

Notes refer to a July 2003 motor vehicle accident but on September 8, 2003, the claimant's gait was normal.  Testing showed full strength in her upper and lower extremities and straight leg raising was negative.  Dr. D. Troy Trimble diagnosed neck pain, thoracic spine pain, and anterior chest and rib pain resulting from a motor vehicle accident and a prior spinal injury.  Dr. Trimble opined that surgical intervention was not needed and neither was an MRI (Ex. 1F).[4]

Results from an April 27, 2004 MRI revealed small to moderate sized, right medial foraminal disk protrusion at C6/7, minimal asymmetric disk/osteophyte complex at C5/6 in the right medial foraminal region without significant central or neural foraminal stenosis, and end plate changes at C5, C6, and C7 that may reflect minimal end plate compression deformities (Ex. 2F).

Post carpal tunnel treatment notes dated 2006 show positive results including full range of motion and good pulse and color and the ability to move her fingers (Ex. 2F).[5]

---

[4]  Plaintiff's chief complaint was spinal pain in the mid and low back extending up into the neck, and pain in the ribs and legs since July 18, 2003.  R. 259.

[5]  On or about June 28, 2004, Dr. Trimble referred Plaintiff to Rodger D. Powell, M.D., regarding Plaintiff's bilateral carpal tunnel syndrome and to evaluate her ulnar neuropathy.  R. 274.  Plaintiff was treated by Dr. Powell from July 22, 2004, to November 6, 2006.  R. 264-73.  The follow-up note of November 6, 2006, indicates that Plaintiff reported "doing fairly well" but "still complains of pain on the dorsal radial aspect of her hand and some numbness and tingling now in the ring and small fingers." R. 264.  Plaintiff had full range of motion after a musculoskeletal exam.  Her original EMG's and nerve conduction studies in 2000 had shown bilateral median nerve neuropathy at the wrist which was mild to moderate and no evidence of cervical

> A review of Dr. Rozboril's records dated March 18, 2010 shows that the claimant has fibromyalgia and osteoarthritis in the hand although records going back to September of 2008 show no specific fibromyalgia testing (Ex. 8F).[6]

radiculopathy.  Follow-up studies in 2005 confirmed bilateral median nerve problems and normal bilateral ulnar nerves.  Plaintiff was to contact Dr. Powell if she had any problems.  R. 265.

   [6]  Dr. Rozboril's patient notes begin on or about September 9, 2008.  R. 350.  Plaintiff was examined as a follow-up for her arthritis.  *Id.*  She had weight gain; off disability and without insurance; could not afford OxyContin; felt stressed, having more pain and mental confusion.  She found a charity program.  Her pain awakes her at night and she hurts all over.  Plaintiff said she was "unable to do ADL's and function daily." *Id.*  Plaintiff had tender costochondral joints and a trace of tibial edema.  His impressions were fibromyalgia and Hepatitis C, chronic.  *Id.*  Plaintiff followed-up with Dr. Rozboril on December 23, 2008, reporting that she was under more stress; off Medicaid but going back on; having more pain; back on Roxicodone; having trouble with her marriage; weight gain; not sleeping well; and tired and having back pain all of the time.  R. 349.  Plaintiff had *tender muscle insertion points at elbows, knees; trace of tibial edema; fingers had no active synovitis.*  His impressions were fibromyalgia; anemia, unspecified; depression, recurrent; and weight gain.  His plan included prescribing Valium, continue of present medications; follow-up in six months; and to stop drinking Coke and limit salt, and monitor her blood pressure.  *Id.*  Plaintiff followed-up with Dr. Rozboril on June 29, 2009, and had a flare up of right knee pain and stiffness lately, which she felt caused pain across her right chest and back; massage helped; weight decreased since her last visit; started taking an iron supplement.  R. 348.  Plaintiff had a small effusion on her right knee; *tender medial knee joint line and popliteal space*; and irritable range of motion and limping gait.  *Id.*  His impressions were knee, likely torn meniscus, and fibromyalgia.  Plaintiff was prescribed a trial of Lyrica and was to continue on other mediations; use a cane; needed to exercise regularly; follow diet; and contact ACMS about health plans and to follow-up in one month.  *Id.*  Plaintiff followed-up on March 18, 2010, almost nine months later.  R. 347, 389.  Plaintiff had applied for disability and was appealing.  She reported persistent pain and stiffness in her muscles; had to carry things; had been exhausted and stressed due to flooding of her home; had not tried Lyrica, "probably could not afford it."  Her hands her stiff and hurting more-goes numb.  She was not sleeping well; cries easily; did not want to try Lyrica, but wanted to increase Oxycodone that she could not afford.  Plaintiff had no malar rash or alopecia; *she had tender neck and trap muscles; tender muscle insertion points at elbows, knees*; no pretibial edema; mild Heberden's and Bouchard's changes; "all MCP's 1+ tender-no synovitis."  *Id.*  His impressions were fibromyalgia and osteoarthritis, hand.  Plaintiff did not need any medication refills; was told to try Aleve twice a day with food; and to follow-up in three months.  Plaintiff declined to start Lyrica.  *Id.*  On August 24, 2010, Plaintiff followed-up for her arthritis and fibromyalgia.  She got married.  Her top left hand was slightly swollen and 2+ tender; no erythema or increased warmth; *tender muscle insertion points at elbows and knees; tender both troch bursa*; hips had non-irritable ROM; and no pretibial edema.  His impressions were fibromyalgia and hypothyroidism.  R. 388.  Oxycodone and Valium were refilled and Plaintiff was to

An office note dated June 16, 2010 from Santa Rosa Community Clinic states that the claimant is alert and oriented and has normal gait and posture (Ex. 11F).[7]

The State agency physician reviewed records and on November 9, 2010 determined that the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday.  The claimant can frequently climb ramps/stairs and frequently balance, kneel, and crawl.  She can occasionally climb ladders/ropes/scaffolds and occasionally stoop and crouch.  The claimant has no manipulative, visual, or communicative limitations. She must avoid concentrated exposure to workplace hazards including machinery and heights (Ex. 13F).

The claimant presented for mental consultative examination on January 26, 2011 with William E. Benet, Ph.D., and reported that she was physically and mentally disabled.  The claimant stated that she has friends and sometimes takes walks.  Testing revealed intact cognitive functioning with no impairment in reasoning or memory functioning.  The claimant has average general intellectual ability and can perform work-related mental tasks involving understanding and memory.  Dr. Benet issued a GAF score of 55 and diagnosed the following: major depressive disorder, single episode, moderate; anxiety disorder not otherwise-specified; and probable benzodiazepine prescription dependence (Ex. 14F)

---

follow-up in four months.  *Id.*  The next reference from Dr. Rozboril is a February 9, 2012, patient note indicating an *almost a two-year hiatus (actually one and one-half year hiatus between visits).*  R. 539.  Plaintiff saw Dr. Rozboril for her arthritis and fibromyalgia.  Plaintiff was receiving her primary care at PCVP.  On examination, Plaintiff had no malar rash or alopecia; no adenopathy, parotid gland swelling, or ulcers.  Regarding her extremities, *Plaintiff had a trace of tibial edema, tender shins*; no skin signs of vasculitis; fingers had no active synovitis; *her CMC joints were tender; tender muscle insertion points at elbows, knees; her knees, ankles have good range of motion and no synovitis.  Id.*  Dr. Rozboril told Plaintiff to get Citracal; she was given a trial of Cymbalta for fibromyalgia and depression; she was told they would follow her thyroid and fibromyalgia and Plaintiff was to return in three weeks to evaluate her response to Cymbalta; her Valium and Oxycodone were refilled.  *Id.*

    [7] On March 4, 2010, Plaintiff appeared as a new patient.  R. 341.  She reported "needing meds and labs," and a history of hypothyroid, and presented as a follow-up for her thyroid disease.  *Id.*  She reported receiving Cytomel at Shands per an endocrinologist but was out of this medication.  *Id.*  On mental status, Plaintiff was alert, her appearance was cooperative and not in acute distress; oriented x3; normal posture and gait; and her voice was normal.  *Id.*  Her HEENT exam was normal.  R. 342.  Her abdomen and musculoskeletal areas were not examined.  *Id.*  The assessment was hypothyroidism; hypertension, benign essential; syndrome, chronic pain; and salpingitis, Eustachian, NOS.  *Id.*; *see* R. 372-81 (patient notes).

[R. 403-06].  According to *DSM-JV-TR,* a GAF score of 55 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.[8] The State agency psychologist reviewed records and on February 2, 2011 determined the claimant to have mild restriction of activities of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration (Ex. 16F).

An April 26, 2011 MRI of the lumbar spine showed progressive degenerative changes of the cervical spine that involve the entire C6 vertebral body and symmetric bulging disks at L4-L5 and L5-S1 without cord impingement (Ex. 18F/6) [R. 436].

The claimant has received medical care from Fourth Avenue Family Practice. Dr. Weber stated that the claimant needs to get off pain medication and attend a pain management clinic and do physical therapy and follow up with her gynecologist.  Notes dated May 27, 2011 report the claimant has normal range of motion in all her extremities and appropriate psychological behavior. Examination on July 14, 2011 was negative for joint pain/muscle aches and on March 15, 2012, the claimant's extremities were normal with normal range of motion.  The claimant was alert and her motor function, sensation, and memory were intact.  The claimant was mildly to moderately depressed on October 12, 2011, though her mood and behavior were appropriate.  On November 16, 2011, Dr. Weber noted multiple sites of muscle pain and tenderness.  He monitored the claimant for depression and adjusted her thyroid medication which improved her condition per notes dated January 24, 2012 when the claimant reported feeling better [R. 438-41].[9]  No findings show that the claimant is disabled (Ex. 19F) [R. 438-532].

---

8  Dr. Benet opined that Plaintiff's prognosis was fair and he recommended that she resume psychiatric treatment for pain management, depression, and anxiety. R. 406.

9  Dr. Weber conducted a 14-point system review and all systems were negative except as noted in the HPI.  R. 438-41.  It was noted that Plaintiff had been without her pain medications and had a flare-up in the back and had problems with chronic pain. Oxycodone was renewed.  Plaintiff was to follow-up with a suggestion she try Cymbalta and use of Mobic for pain.  Plaintiff reported she was worse when stressed and reported increased anxiety with appointment with her attorney.  She stated she needed Valium with increased anxiety associated with litigation associated with insurance adjustment. Plaintiff was currently charity care.  Plaintiff was tapering off Valium and encouraged to reduce Valium if possible.  She reported continue back and leg pain associated with her motor vehicle accident in 2006; had not been to physical therapy lately but reported it was helpful when she did in the past.  Plaintiff was referred to physical therapy.  R. 440.

A radiology report of April 1, 2011 was negative for left foot issues.  An MRI performed on April 26, 2011 showed progressive degenerative changes of the cervical spine involving the entire C6 vertebral body and symmetric bulging disks at L4-L5 and L5-S1 without cord impingement.  Test results dated January 4, 2012 showed an unchanged uterine fibroid and no evident acute abnormality (Ex. 23F).

The claimant presented to the emergency room on May 26, 2011 for complaints of vaginal bleeding but was asymptomatic and was thus discharged (Ex 22F/8).

A note by Dr. Rozboril dated March 6, 2012 states that the claimant's conditions of chronic fibromyalgia with chronic pain, chronic hepatitis C, and significant depression related to her chronic pain cause her to be dysfunctional (Ex. 20F).[10]

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In assessing credibility to the claimant, the record reveals little lifetime earnings which raises some questions as to whether her current unemployment is truly the result of medical problems.

The claimant partakes in a wide array of activities that are not the type expected from a person who is totally disabled.  At the hearing, she testified that standing and walking are extremely difficult due to severe foot pain yet on March 2, 2012 reported (Ex. 11E/1) that she chooses to take walks.  Mentally, the claimant stated she can pay attention for just two seconds (Ex. 11E/6) yet followed along and answered questions at her hearing which lasted for more than an hour.

---

   10  Plaintiff was seen by Dr. Rozboril on March 1, 2012, for her arthritis and fibromyalgia. R. 536; *see supra* at n.6.  She did not start Cymbalta.  She reported more generalized pain all over, pain in legs; numbness and burning pain in hands.  She requested a "new letter" as her disability hearing was approaching.  *Id*.  *Plaintiff had tender neck and trap muscles*; no malar or alopecia.  Regarding her extremity, she had decreased sensation of her left toes,; absent digital pitting scars or ulcers; no color or sensory changes; no skin signs of vasculitis; no pretibial edema-tender shins; using a cane to ambulate; and she had tender muscle insertion points at elbows and knees.  *Id*. Dr. Rozboril's impressions were fibromyalgia; chronic pain syndrome; depression, recurrent without ideation of suicidal; and hypothyroidism.  *Id*.  Plaintiff was referred to Endocrinology and given a prescription for Synthroid and Cytomel and told to restart Cymbalta when she feels better.  *Id*.  As noted by the ALJ, there is also a March 6, 2012, letter to the Social Security Administrator stating, in part, that Plaintiff "has chronic Fibromyalgia Syndrome with chronic pain; this is a chronic syndrome for which there is no cure."  R. 533-34; *see* R. 258 (undated To Whom It May Concern letter).

The care the claimant has received has been relatively routine and conservative in nature and effective in managing her symptoms. Furthermore, though the claimant alleges that her mental condition has deteriorated, she has chosen to not follow through with referrals for mental health evaluation/treatment. Such actions indicate that the claimant's symptoms may not be as severe or limiting as she alleges.

In looking at the opinion evidence, very little weight is given to the recent opinion of Dr. Rozboril (Ex. 20F) as the claimant was gone from his practice for two years. Moreover, Dr. Rozboril's treating notes do not support that the claimant is disabled. There is no indication in treatment notes of multiple tender points and the claimant does not take fibromyalgia medication. The remaining treating source opinions deserve significant weight as these sources are familiar with the claimant's subjective complaints and are consistent with the record on the whole. Significant weight is given to the opinion of the consultative examiner (Ex. 14F) as this source examined the claimant and issued an unbiased opinion that is well supported by the medical evidence of record. The opinions of the State agency evaluators (Ex. 9F; 13F; 15F-16F) deserve significant weight as these sources reviewed records and issued unbiased opinions that are consistent with and well supported by the record in its entirety.[11]

R. 23-26.

---

[11]   On June 28, 2010, Angeles Alvarez-Mullin, M.D., prepared a Psychiatric Technique (PRT) and determined there was insufficient evidence to provide a medical disposition. R. 352, 364 (Exhibit 9F). On November 9, 2010, Sunita Patel, M.D., prepared a Physical RFC Assessment. R. 394-401 (Exhibit 13F). Dr. Patel noted that Plaintiff had a history of fibromyalgia, referring, in part, to Dr. Rozboril's recent treatment notes of March 18, 2010. *Cf.* R. 399 *with* R. 347, 389; *see* R. 401 (detailed analysis of patient notes from March 26, 2001 to August 24, 2010 (R. 388)). Dr. Patel found Plaintiff could perform light work and that she could frequently climb ramps/stairs, balance, kneel, and crawl, and occasionally climb ladders/ropes/scaffolds, stoop, and crouch. R. 396. She had no manipulative, visual, or communicative limitations and one environmental limitation to avoid concentrated exposure to hazards. R. 397-98. On February 2, 2011, Elizabeth Michalec, Ph.D., prepared a Mental RFC Assessment and a PRT. R. 408-25 (Exhibits 15F and 16F). Dr. Michalec opined, in part, that Plaintiff, mentally, as physical allows, appears able to understand and remember basic tasks; carry out simple and complex tasks; maintain concentration and attention for routine, uncomplicated tasks; complete a normal work week without excessive interruptions from psychologically based symptoms if tasks are within her capacity; relate adequately to supervisors and co-workers; and to adapt to simple changes and avoid work place hazards. R. 410; *see* R. 424 (PRT consultant's notes).

**V. Legal Analysis**

    **A.  Legal standards in fibromyalgia cases pre and post-dating SSR 12-2p, effective July 25, 2012.**

The American College of Rheumatology has stated that fibromyalgia is both real and difficult to confirm.  *See generally* Frederick Wolfe, *et al.*, The American College of Rheumatology Preliminary Diagnostic Criteria for Fibromyalgia and Measurement of Symptom Severity, 62 Arthritis Care & Research 600 (May 2010).  An extensive body of case law pre-dates the effective date of SSR 12-2p relating to courts' treatment of social security disability claims based on fibromyalgia.

Chronic pain, multiple painful points on the body, fatigue, and sleep deprivation are hallmark symptoms of fibromyalgia:

> The Ninth Circuit has described fibromyalgia as a "rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue.  Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease."  *Benecke v. Barnhart*, 379 F.3d 587, 589-90 (9th Cir. 2004).

Davis v. Astrue, 287 F. App'x 748, 762 (11th Cir. 2008) (unpublished).[12]  The signs of fibromyalgia, according to American College of Rheumatology guidelines, are primarily tender points on the body.  Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003).  In Green-Younger, the court said: The claimant there "exhibited the clinical signs and symptoms to support a fibromyalgia diagnosis under the American College of Rheumatology (ACR) guidelines, including primarily widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points on the body."  *Id.*

---

[12]  Unpublished decisions of the Eleventh Circuit are not binding precedent.  *See* 11th Cir. R. 36-2.

A patient's subjective complaint "is an essential diagnostic tool" for the treating physician.  Green-Younger, 335 F.3d at 107 (quoting Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997)).  Moreover, it is relevant to the weight of a treating physician's opinion that he or she has "personally monitored the effectiveness of various therapies and found that they failed to provide any significant improvement."  *Id.  See* Cox v. Barnhart, 345 F.3d 606, 609 (8th Cir. 2003) (finding treating physician's opinion not conclusory in fibromyalgia case when it was the "culmination of numerous visits [plaintiff] had with her past doctors, and his experience with treating her chronic pain").

It is a misunderstanding of the nature of fibromyalgia to require "'objective' evidence for a disease that eludes such measurement."  Green-Younger, 335 F.3d at 108.  "Moreover, a growing number of courts, including our own . . . have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.'"  *Id.* (citations to cases from 6th, 8th, and 9th Circuits omitted).  "[P]hysical examinations will usually yield normal results--a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions."  *Id.* at 108-09 (citation omitted).  "[S]welling of the joints is not a symptom of fibromyalgia . . . ."  Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).[13]  *See* Brown v. Barnhart, 182 F. App'x 771 (10th Cir. 2006) (unpublished).  The Eleventh Circuit

---

[13]  "There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and -- the only symptom that discriminates between it and other diseases of a rheumatic character --multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.  All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch."  Sarchet, 78 F.3d at 306-07.

adopted this reasoning in an unpublished decision, Stewart v. Apfel, No. 99-6132, 245

F.3d 793, 2000 U.S. App. LEXIS 33214, at *8-9 (11th Cir. 2000) (table).

In Moore v. Barnhart, while acknowledging that Stewart is not binding precedent,

the court said:

> In *Stewart*, we reviewed medical research on fibromyalgia, which often lacks
> medical or laboratory signs, and is generally diagnosed mostly on an individual's
> described symptoms. Because the impairment's hallmark is thus a lack of
> objective evidence, we reversed an ALJ's determination that a fibromyalgia
> claimant's testimony was incredible based on the lack of objective evidence
> documenting the impairment. *Id.* at *9, n.4.

405 F.3d at 1211 n.3. *See* Somogy v. Comm'r of Soc. Sec., 366 F. App'x 56, 63-64

(11th Cir. 2010) (unpublished).

In her initial memorandum, *see* doc. 15 at 9-10, the Commissioner cited in

passing to SSR 12-2p, which "provides guidance on how we develop evidence to

establish that a person has a medically determinable impairment (MDI) of fibromyalgia

(FM), and how we evaluate FM in disability claims and continuing disability reviews

under titles II and XVI of the Social Security Act (Act)." *Id.* at *1. Plaintiff did not cite to

this SSR in her initial memorandum. Doc. 14.

The Social Security administration issued SSR 12-2p to assist factfinders in the

evaluation of fibromyalgia. SSR 12-2p, 2012 SSR LEXIS 1 at *1. Social Security

Ruling 12-2p "provides that once a claimant is determined to have fibromyalgia her

statements about symptoms and functional limitations are to be evaluated according to

the two-step process set forth in SSR 96-7p, 1996 SSR LEXIS 4." Tully v. Colvin, 943

F. Supp. 2d 1157, 1165 (E.D. Wash. 2013); *see* SSR 12-2p, 2012 SSR LEXIS 1 at *13.

"These policies provide that '[i]f objective medical evidence does not substantiate the

person's statements about the intensity, persistence, and functionally limiting effects of

symptoms, we consider all other evidence in the case record.'" *Id.* (quoting SSR 12-2P, 2012 SSR LEXIS 1); *see* Evaluation of Fibromyalgia, 77 Fed. Reg. 43,640 (July 25, 2012).

Social Security Ruling 12-2p provides that the Social Security Administration "will find that a person has an MDI of FM if the physician diagnosed FM and provides the evidence we describe in section II.A. *or* section II.B., *and* the physician's diagnosis is not inconsistent with the other evidence in the person's case record."  SSR 12-2p, 2012 SSR LEXIS 1 at *4-5 (emphasis added).  Sections II.A. and II.B. include *two sets of criteria for diagnosing fibromyalgia*-the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia *or* the 2010 ACR Preliminary Diagnostic Criteria.  *Id.*

The first set of criteria (1990) requires that the claimant demonstrate: (1) a history of widespread pain; (2) at least 11 positive tender points[14] on physical examination and the positive tender points must be found bilaterally, on the left and right sides of the body and both above and below the waist; *and* (3) evidence that other disorders, which could cause the symptoms or signs were excluded.  SSR 12-2p, 2012 SSR LEXIS 1 at *5-7 (§ II.A.1.-3. criteria).

The second set of criteria (2010) requires that the claimant demonstrate: (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia

---

[14]  The criteria in section II.B. of SSR 12-2p may be used "to determine an MDI of FM if the case record does not include a report of the results of tender-point testing, or the report does not describe the number and location on the body of the positive tender points."  2012 SSR LEXIS 1 at *6 n.6 (§ II.A.2.b.).  In other words, tender-point testing under section II.A.2. may not be the exclusive manner to determine an MDI of FM.

symptoms, signs, or co-occurring conditions[15]; *and* (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions[16] were excluded.  SSR 12-2p, 2012 SSR LEXIS 1 at *7-9.  *See also* Lillard v. Comm'r, Soc. Sec., Civil Case No. JKB-13-1458, 2014 U.S. Dist. LEXIS 66720, at *6 n.1 (D. Md. May 14, 2014).

Social Security Ruling 12-2p provides guidance regarding the documentation needed, other sources of evidence, and what can be done if the evidence is insufficient. Guidance is also provided regarding how FM is considered in the five-step sequential evaluation process.  SSR 12-2p, 2012 SSR LEXIS 1 at *9-19.  As indicated above, after the ALJ issued her decision on July 24, 2012, R. 27, but *before* the Appeals Council denied Plaintiff's appeal on June 27, 2014, R. 1, the Social Security Administration published SSR 12-2p on July 25, 2012.  SSR 12-2p, 2012 SSR LEXIS 1 (eff. July 25, 2012).

---

[15]  Symptoms and signs that may be considered include the "(s)omatic symptoms" referred to in Table No. 4, "Fibromyalgia diagnostic criteria," in the 2010 ACR Preliminary Diagnostic Criteria.  We consider some of the "somatic symptoms" listed in Table No. 4 to be "signs" under 20 C.F.R. 404.1528(b) and 416.928(b).  These "somatic symptoms" include muscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms.

2012 SSR LEXIS 1 at *8 n.9.

[16]  *See* SSR 12-2p, 2012 SSR LEXIS 1 at *9 n.10 for a list of these conditions.

Several district courts have remanded SSI/DIB cases to the Commissioner for reconsideration of a claimant's case (and claim of disability based on fibromyalgia) in light of SSR 12-2p.  *See, e.g.*, Dry v. Comm'r. Soc. Sec. Admin., Civil No. SAG-13-3168, 2014 U.S. Dist. LEXIS 170064 (D. Md. Dec. 9, 2014); Holman v. Colvin, Case No. 4:13-CV-00502-MHH, 2014 U.S. Dist. LEXIS 124860 (N.D. Ala. Sept. 8, 2014); Iles v. Colvin, Case No. CIV-13-221-F, 2014 U.S. Dist. LEXIS 43752 (W.D. Okla. Mar. 14, 2014); Schuster v. Colvin, Civil Action No. 13-cv-0718-WJM, 2014 U.S. Dist. LEXIS 26070 (D. Colo. Feb. 28, 2014).  *But see* Stines v. Colvin, 3:13-CV-02172, 2014 U.S. Dist. LEXIS 121082, at *34-35 (M.D. Pa. Aug. 28, 2014) (remand not required where SSR 12-2p effective after ALJ's decision (Feb. 14, 2012) but before Appeals Council denied review (June 21, 2013)).[17]  A different result was reached when the effective date of SSR 12-2p came *after* the decision of the Appeals Council.  *See, e.g.*, Kurowski v. Colvin, Civil Action No. 4:12cv137, 2013 U.S. Dist. LEXIS 134993 (E.D. Va. Sept. 18, 2013).  Although social security rulings do not carry the "force and effect of the law or regulations," *see* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984), "[t]hey are binding on all components of the Social Security Administration."  20 C.F.R. § 402.35(b)(1).

Pursuant to this Court's direction, doc. 16, the parties filed supplemental memoranda addressing whether SSR 12-2p impacts this case and whether remand is appropriate.  Docs. 17 and 20.  The Commissioner responded that remand is not required, in part, because the Appeals Council stated that "[w]e applied the laws, regulations and rulings in effect as of the date we took this action," R. 1, and necessarily "found it complied with the requirements of SSR 12-2p (TR. 1)," even though SSR 12-2p

---

[17]  The plaintiff raised this issue in Holman, Iles, Schuster, and Gamez, *see infra* at n.18, but it does not appear the pro se plaintiff raised this issue in Dry.

is not cited by the Appeals Council.[18]  Doc. 17 at 2.  Plaintiff responds that she "does not believe the [ALJ] was required to apply SSR 12-2p to the case at bar."  Doc. 20.  The Court agrees that ALJ McGarry was not required to consider SSR 12-2p because this ruling was not effective until after her decision was entered.  The ALJ did not have the benefit of SSR 12-2p when considering whether Plaintiff's claim of fibromyalgia is disabling.  *See* Holman v. Colvin, 2014 U.S. Dist. LEXIS 124860, at *12-13.  The issue is whether, as a matter of law, the Court should remand the case based on SSR 12-2p becoming effective *after* the ALJ's decision but *before* the Appeals Council based on the facts of this case.  *See* Doc. 16; *see also supra* at n.1.

### B.  The decision rendered by the ALJ should be reversed and the case remanded to the ALJ for consideration of the facts of this case in light of SSR 12-2p.

Plaintiff argues that the ALJ erred by failing to give great weight to the opinion of Michael B. Rozboril, M.D., Plaintiff's treating rheumatologist, who opined that Plaintiff had fibromyalgia, *see* R. 347-50, 533, 536, 539, and ultimately opined that Plaintiff is dysfunctional as a result of her fibromyalgia and her depression. R. 533; *see* doc. 14 at 8-18.  Plaintiff bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of her claim.  *See* 20 C.F.R. § 416.912(a); Moore v. Barnhart, 405 F.3d at 1211.  The responsibility of weighing the medical evidence and resolving any conflicts in the record rests with the ALJ.  *See* Battle v. Astrue, 243 F. App'x 514, 523 (11th Cir. 207) (unpublished).  Although a claimant may provide a statement containing a treating physician's opinion of her remaining capabilities, the ALJ must evaluate such a statement in light of the other

---

[18]  This argument was accepted in Gamez v. Colvin, No. 13-4199-CV-W-DGK-SSA, 2014 U.S. Dist. LEXIS 114710, at *12-13 (W.D. Mo. Aug. 19, 2014).

evidence presented and the ALJ must make the ultimate determination of disability.  20

C.F.R. §§ 416.912, 416.913, 416.927, 416.945.

Plaintiff does not expressly argue that the ALJ erred at step 2 by not finding

fibromyalgia a severe impairment.[19]  Doc. 14 at 8-18; *but see* doc. 15 at 8.  At step 2,

the ALJ determined that Plaintiff has several severe impairments not including

fibromyalgia.  R. 21.  The ALJ did not "accept the claimant's assertion that fibromyalgia

is a severe impairment as the medical record reveals no acceptable diagnostic testing

results.  Additionally, the claimant sought no treatment for two years for this alleged

condition and took no medication for it."  *Id.*  ("An impairment or combination of

impairments is not severe if it does not significantly limit [the claimant's] physical or

mental ability to do basic work activities."  *See* 20 C.F.R. §416.921(a).)

Although Dr. Rozboril is Plaintiff's treating rheumatologist[20] and he noted that

Plaintiff had several tender points, *see, e.g.*, *infra* at n.24, there is no indication in this

---

[19]  At step 2, the issue is whether the claimant has shown that he or she has a condition that has more than "a minimal effect of her ability to: walk, stand, sit, lift, push, pull, each, carry, or handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521).  To be considered "severe," a medical condition must constitute more than a "deviation from purely medical standards of bodily perfection or normality."  McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).  "[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'"  Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986) (citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984); Flynn, 768 F.2d at 1274.  It has been said that step 2 of the sequential analysis may do no more than screen out de minimus claims.  Stratton v. Bowen, 827 F.2d 1447, 1453 (11th Cir. 1987).

[20]  Generally, more weight is given to the opinion of a specialist, such as Dr. Rozboril, "about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  20 C.F.R. § 416.927(c)(2), (5); *see* Benecke v. Barnhart, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (noting that "[s]pecialized knowledge may be particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community," thus rheumatologists'

record that he performed a multiple tender spot examination ("more precisely 18 fixed

locations on the body") and determined that Plaintiff had "at least 11 of them to be

diagnosed as having fibromyalgia) that when pressed firmly cause the patient to

flinch."[21]  See Sarchet, 78 F.3d at 306-07; Land v. Astrue, Case No.

5:09cv369/SPM/MD, 2011 U.S. Dist. LEXIS 21694, at *22-24 (N.D. Fla. Jan. 6, 2011)

(affirming Commissioner's denial of disability benefits despite treating rheumatologist's

impression of fibromyalgia), adopted, 2011 U.S. Dist. LEXIS 21773 (N.D. Fla. Mar. 3,

2011).[22]

It is not clear that in assessing Plaintiff's RFC as part of the step 4 analysis, the

ALJ considered Plaintiff's allegation of fibromyalgia and resulting symptoms as a

"medically determinable impairment," in part, by referring to Dr. Rozboril's patient notes

and his diagnosis of fibromyalgia.[23]  See R. 23-26.  In making her RFC determination,

---

opinions were entitled to greater weight than those of other physicians) (Benecke
quoted in Somogy, 366 F. App'x at 65 n.13).

[21]  Social Security Ruling 12-2p provides a picture of the back and front view of
the body and includes 18 "tender point sites."  SSR 12-2p, 2012 SSR LEXIS 1 at *7; see
also, Evaluation of Fibromyalgia, 77 Fed. Reg. 43,640 at 43,642 (July 25, 2012).

[22]  Like Land, this is not a case where a treating rheumatologist determined that a
patient had greater than 50% of positive points and, as a result, opined that the patient
had fibromyalgia.  See Land v. Astrue, 2011 U.S. Dist. LEXIS 21694, at *22-23 n.4.  In
Land, the ALJ determined that giving the claimant the benefit of the doubt, the claimant
had fibromyalgia and that it was severe.  2011 U.S. Dist. LEXIS 21694, at *22.  The ALJ
did not credit the claimant's subjective complaints of disabling pain and determined that
her fibromyalgia was not so severe as to be disabling from any work.  Id. at 22-24.  No
error was shown.  Id.  Here, the ALJ did not find Plaintiff's claim of fibromyalgia severe.
R. 21.

[23]  Through the use of boilerplate language, the ALJ determined that Plaintiff's
"medical determinable impairments could reasonably be expected to cause the alleged
symptoms; however, the claimant's statements concerning the intensity, persistence
and limiting effects of these symptoms are not credible to the extent they are
inconsistent with the above [RFC] assessment."  R. 25.

the ALJ referred, in part, to Plaintiff's testimony "that hand pain, numbness, and spasm is caused by fibromyalgia." R. 23. (The ALJ also considered Plaintiff's credibility at steps 3 and 4 (RFC assessment). R. 21-26.) The ALJ referred to Dr. Rozboril's treatment "records dated March 18, 2010 shows that the claimant has fibromyalgia and osteoarthritis in the hand although records going back to September of 2008 show no specific fibromyalgia testing (Ex. 8F)." R. 24. The ALJ refers to another note from Dr. Rozboril "dated March 6, 2012 states that the claimant's conditions of chronic fibromyalgia with chronic pain, chronic hepatits C, and significant depression related to her chronic pain cause her to be dysfunctional (Ex. 20F)." R. 25. The ALJ concludes her observations of Dr. Rozboril:

> In looking at the opinion evidence, very little weight is given to the recent opinion of Dr. Rozboril (Ex. 20F) as the claimant was gone from his practice for two years. Moreover, Dr. Rozboril's treating notes do not support that the claimant is disabled. There is no indication in treatment notes of multiple tender points and the claimant does not take fibromyalgia medication.

R. 26.[24] Notwithstanding her reliance on other evidence to support her determination that Plaintiff is not disabled, *see, e.g.*, R. 21-27, the ALJ did not have the benefit of SSR 12-2p to guide her analysis of Plaintiff's claim of disabling fibromyalgia. It is not clear that the ALJ's decision would have been the same had she considered the guidance of SSR 12-2p at steps 2 through 5. *See* Holman v. Colvin, 2014 U.S. Dist. LEXIS 124860, at *13.

―――――――――――――

[24] Since his first examination of Plaintiff on September 9, 2008, Dr. Rozboril noted that Plaintiff had tender costochondral joints, R. 350; tender muscle insertion points at the elbows and knees, R. 349; tender medial knee joint line, R. 348; tender muscle insertion points at elbows and knees, R. 347, 389; tender warm insertion points at elbows and knees and tender both troch bursa, R. 388; tender CMC joints and tender muscle insertion points at her elbows and knees, R. 539; and again tender muscle insertion points at her elbows and knees, R. 536.

Notwithstanding the lack of Eleventh Circuit precedent that explains whether SSR 12-2p is retroactive, this Court finds Iles v. Colvin, 2014 U.S. Dist. LEXIS 43752, and similar rulings persuasive.  *See supra* at 22.  The ALJ did not have the opportunity to consider the evidence in light of SSR 12-2p, and, as a result, a remand is appropriate.  On remand, the ALJ should evaluate Plaintiff's fibromyalgia symptoms and the medical and non-medical evidence of record in accordance with SSR 12-2p.  In recommending remand, no opinion is expressed as to whether Plaintiff is entitled to benefits.

## VI.  Conclusion

Considering the record as a whole, it is respectfully **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and **REMANDED** for further proceedings.

**IN CHAMBERS** at Tallahassee, Florida, on March 25, 2015.

> **s/  Charles A. Stampelos**
> **CHARLES A. STAMPELOS**
> **UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**